· CORRUGATED BAR CO. v. TRUSSED CONCRETE STEEL CO. et al.

(Circuit Court of Appeals, Eighth Circuit. March 12, 1917.)

No. 4734.

PATENTS ⬦328—INVENTION—CONCRETE AND METAL FLOOR CONSTRUCTION.
  The Johnson patent, No. 633,285, for a concrete and metal floor and
  ceiling construction, consisting of a slab of concrete having transversely
  corrugated bars of metal embedded in the lower portion thereof and loops
  of pliable wire suspended across such bars, with the ends projecting
  below the concrete to support the ceiling below the floor, is void for lack
  of patentable novelty and invention, in view of the prior art, which
  disclosed in earlier patents all the essential elements of the patented
  structure, requiring only mechanical skill for their combination.

Appeal from the District Court of the United States for the Eastern District of Missouri; David P. Dyer, Judge.

Suit in equity by the Corrugated Bar Company against the Trussed Concrete Steel Company and others. Decree for defendants, and complainant appeals. Affirmed.

James A. Carr, of St. Louis, Mo. (T. Percy Carr and Amasa M. Holcombe, both of St. Louis, Mo., on the brief), for appellant.

Fred L. Chappell, of Kalamazoo, Mich. (C. C. Linthicum, of Chicago, Ill., and Edward C. Eliot, of St. Louis, Mo., on the brief), for appellees.

Before SANBORN and HOOK, Circuit Judges, and AMIDON, District Judge.

SANBORN, Circuit Judge. The Corrugated Bar Company, a corporation, the plaintiff below, appeals from a decree by which its complaint for an infringement by the defendants, Trussed Concrete Steel Company, a corporation, and others, of letters patent No. 633,285, issued to Albert L. Johnson, September 19, 1899, for an improvement in fireproof floor construction was dismissed. Johnson's improvement consisted principally: (1) In the use of transversely corrugated metallic bars embedded in the lower part of concrete slabs forming the flooring, or embedded in concrete ribs on the lower side and forming a part of such a flooring, for the purpose of increasing the tensile strength of the lower portion of the flooring, or of the ribs below it; and (2) in the use of a loop of pliable wire suspended astraddle such bars and embedded with them in the concrete ribs or the lower portion of the concrete flooring, with the ends of the wire projecting below the concrete for the purpose of hanging or supporting the ceiling below the floor. In this patent there are nine claims. The first six relate to combinations of the patentee's transversely corrugated bars with concrete flooring, with concrete flooring provided with ribs, with concrete flooring strengthened by expanded metal embedded therein, and with such flooring resting upon concrete ribs and concrete haunches based on the flanges of supporting I-beams. But the use of the specific transversely corrugated bars of Johnson conditions the novelty and

patentability of each of them. Claim 1 illustrates them and reads in this way:

"1. In a concrete and metal construction, a slab of concrete having bars of metal embedded in the lower portion thereof, each of said bars being of substantially uniform thickness throughout its length and having corrugations arranged in planes substantially perpendicular to the axis of the bar, substantially as described."

Claims 7, 8, and 9 rest upon the use of the suspending loops of wire imbedded in the concrete floor straddling the reinforcing rods embedded in the concrete and extending below the flooring for the purpose of hanging the ceiling beneath it. Claim 7 illustrates them and reads in this way:

"7. A fireproof flooring and ceiling construction comprising a main flooring layer of concrete having strengthening ribs on its under side, transversely corrugated bars of substantially uniform thickness throughout their length embedded in said ribs, and ceiling hangers suspended from said bars, substantially as described."

The maintenance of this suit is dependent, first, upon the novelty and patentability of Johnson's transversely corrugated bar in the combinations of the first six claims, for the bar made and used by the defendants in their concrete floors undoubtedly infringes, if the devices of these claims were patentable; and, second, upon the patentability of the devices described in the three claims for the combinations of the suspended ceilings, and, if these claims were patentable, upon the infringement thereof. Were Johnson's claims for the combinations of his corrugated bars with concrete flooring, in the various ways he specified, novel and patentable? Laying aside for the moment his corrugated bars, every other element and device described in the first six claims of his patent was old and well known before he made his alleged invention, and a careful review of the prior art has convinced that there was nothing required beyond the skill of the ordinary mechanic to conceive and construct any of the devices of these claims unless Johnson's corrugated bar was novel and made them patentable. Concrete flooring, ribbed concrete flooring, concrete haunches to protect steel and iron from fire and to sustain flooring, concrete flooring reinforced by rods or by expanded metal embedded therein to increase the tensile strength of the flooring, had been constructed, detailed descriptions of them had been published, patents for many forms of them had been issued before Johnson conceived or formed the devices of any of these first six claims. Indeed, in his specification he writes:

"The present system of fireproof floor construction consists of haunches of concrete 1, resting on the lower flanges of adjacent I-beams 2, incorporated into the building structure, a series of concrete ribs 3, extending from I-beam to I-beam, and a main floor sheet or layer 4 of concrete on said ribs and haunches and covering all the space between the I-beams, all incorporated as one solid mass."

It is, therefore, upon the novelty and patentability of his transversely corrugated bar that the plaintiff must rely to sustain the validity of the first six claims of his patent. There was no novelty in the use of bars or rods of metal, round, square, twisted, smooth, or rough, in con-

crete floors, or of concrete ribs to increase their tensile strength. It was not, therefore, the novelty of this use upon which Johnson relied for his patent, but upon the novelty and utility of the specific form of his bar. His argument was:

Smooth bars slip when embedded in the concrete, much of their tensile strength is thereby lost, and the thing desired is a bar which will not slip and will not split the concrete. My transversely corrugated bar is new; it is less liable to slip and less liable to split the concrete than any other bar and hence for the purpose of reinforcement is the most useful. Therefore it, and the combinations of it with concrete flooring, which I claim, are patentable.

Thus he wrote in his specification:

"Although the bond between concrete and metal is originally strong, such bond becomes broken or weakened in the course of time by the ordinary use and wear of the floor. For this reason transverse indentations or corrugations are formed in the bar, so that, regardless of the bond, the bar is so incorporated into the rib as to utilize its full tensile strength. The best arrangement of the indentations or corrugations is in planes at right angles to the axis of the bar; but considerable variation in their direction is permissible. * * * But under ordinary circumstances such variations should not exceed 15 degrees from the perpendicular plane above defined. When the indentations or corrugations are inclined to the axis of the bar, their ridges act as wedges tending to split the concrete."

So it is that in the last analysis the question is whether or not the fact that Johnson described and claimed "corrugations arranged in planes substantially perpendicular to the axis" of his bar sustains the validity of his patent.

In the Swiss patent, No. 10,703, of June 29, 1895, to Fietz & Leuthold, there is a description of precautionary measures against longitudinal thrust of iron reinforcements of cement structures. It is there stated that the subject of the invention is round iron fitted with projections located at short distances on the periphery and that:

"On the round iron *a* * * * are provided the projections *b*, which may be of any given form; e. g., in the shape of teeth, bosses," etc.

It is also there stated that:

"This invention relates to such precautionary means in connection with iron reinforcements for cement structures, the subject of the invention being round iron fitted with projections located at short distances on the periphery. Figs. 1, 2 and 3 show an example of such round iron; Figs. 1 and 3 being views of the same, respectively, at an angle of 90 degrees to each other."

A glance at these Figures 1 and 3 satisfies that they disclosed protuberances in the form of rings upon the iron bars which were substantially perpendicular to the axis of the bars.

Hyatt, in letters patent No. 206,112, issued July 16, 1878, wrote thus in his specification:

"Fig. 2 represents a flat tie, formed with raised or protuberant parts *a a*. These protuberances may be shaped according to fancy. They may be pins or bosses, as shown; or the surface may be crimped, corrugated, or indented, as shown in Figs. 3 and 4. Nonslipping ties, made substantially as herein described and illustrated, I propose to make and put upon the market as a new manufacture, and as a substitute for metal in beam form."

The corrugations in Hyatt's Fig. 3 appear to have been in planes substantially perpendicular to the axis of the tie.

Ransome, in his patent No. 516,111, issued March 6, 1894, claims:

"In concrete construction a monolithically embedded tension bar" and a monolithically embedded compression bar.

In his specification he presents a figure of a compression bar of cast iron which has corrugations arranged in planes substantially perpendicular to the axis of the bar. After describing his compression bars and his tension bars, he writes:

"These bars can be forged, rolled, cast, or otherwise formed, with any of the usual bonds on or in their surfaces for their more perfect union with the concrete."

The bars shown in the Ransome patent were tapering bars of maximum size about their center, tapering or stepping smaller from that point to the ends. The examiner in the Patent Office rejected claims 1, 2, 3, and 5 of Johnson's original application upon Ransome's patent, until Johnson amended them by describing his bar as "of substantially uniform thickness throughout its length," and upon that amendment they were allowed. The descriptions in the specifications and claims of the patents to which reference has been made seem to deprive the corrugated bar of Johnson of the requisite novelty to entitle it to patentability. There was evidence in the case upon the question of whether or not Johnson's bar was less likely to split the concrete than that of Ransome, but it does not satisfy that the affirmative of that proposition was sustained.

Counsel argue, however, that notwithstanding the prior description and patents of metal bars provided with corrugations arranged in planes substantially perpendicular to the axis of the bars, for the express purpose of bonding them more securely to the concrete in which they were embedded, Johnson's bar was patentable because he perceived and stated in his specifications that corrugations thus arranged were more efficient than they would be if they varied more than 15 degrees from the perpendicular to the axis, and no one had ever stated this fact before; and they cite Badische Anilin & Soda Fabrik v. Kalle (C. C.) 94 Fed. 163, 166, 168, Keasbey & Mattison Co. v. Philip Carey Mfg. Co. (C. C.) 139 Fed. 571, 576, A. R. Mosler & Co. v. Lurie, 209 Fed. 364, 126 C. C. A. 290, Brill v. Third Avenue R. Co. (C. C.) 103 Fed. 289, 292, 293, and other authorities of like nature. They have been read and considered. But the fact remains that the purpose of the protuberances and corrugations on the bars of Fietz & Leuthold, Hyatt, and Ransome was the same as the purpose of Johnson's corrugations. That purpose was to bond the metal bars to the concrete. Fietz & Leuthold disclosed protuberances or corrugations on their bars for this purpose, arranged in planes substantially perpendicular to the axis of their bars. It is true that they also disclosed protuberances otherwise arranged and for the same purpose. But, given a metal bar, corrugations thereon, and the desideratum to prevent that bar from slipping when embedded in concrete, and it does not require the genius of an inventor to perceive, and to apply the knowledge, that corrugations

of a given size, arranged substantially perpendicular to the axis of a bar, will accomplish the object of preventing its slipping more effectually than when they are inclined more nearly to the horizontal. Such knowledge and its application fall far within the attainments of a mechanic skilled in the art, if not within the attainments of men of still less skill and mechanical information.

A review of the prior art and a consideration of the object Johnson sought to attain by his corrugated bar and of the means he conceived to accomplish his purpose have satisfied that there was no such novelty in the arrangement of its corrugations or their use for this purpose as rendered either the bar or its corrugations patentable. And when we go farther, when we turn to the combinations of this unpatentable corrugated bar with concrete slabs (claim 1), with concrete ribs and concrete slabs (claim 2), with concrete slabs reinforced with expanded metal (claim 3), with concrete flooring and strengthening concrete ribs (claim 4), with I-beams, fireproof concrete flooring, and concrete ribs thereunder (claim 5), and with I-beams, concrete haunches on the flanges thereof, concrete flooring strengthened by expanded metal and concrete ribs (claim 6), it is difficult to discover any novel discovery or invention in any of them. It is true that no single patent in the prior art discloses the exact combination of some of these claims, so that such prior patent can be declared absolutely to anticipate them. But Orr, in his patent No. 471,772, issued March 29, 1892, described the combination of I-beams, metal rods extending from the I-beams drooping from the top to near the bottom thereof between the beams, concrete flooring between the I-beams, with concrete ribs beneath it resting on the supporting rods, "so that the cement is bonded together by the suspenders and the load sustained thereby." McCarthy, in his patents No. 520,489 and No. 520,490, issued May 29, 1894, portrays wires fastened to the upper flanges of I-beams or to anchor plates secured thereto, drooping between the I-beams, embedded in concrete flooring and supporting it. The fact that in these patents the rods and wires support the concrete flooring and are not used, as in Johnson's combinations, solely to increase the tensile strength of the lower part of the floor or the ribs, has not been overlooked. But in view of the fact that before Johnson claimed to have made his alleged invention the use of rods and wires embedded in concrete and bonded thereto by protuberances, roughness, and corrugations so arranged as to be substantially perpendicular to their axis, for the purpose of increasing the tensile strength of the concrete, was well known to those skilled in the art, in view of the fact that the use of ribs of concrete under slabs and floors of concrete was not new, that the use of expanded metal embedded in concrete to give it tensile strength was old, and the use of concrete haunches to protect steel and iron from fire and to support weight was familiar to constructors of buildings, it is impossible to resist the conclusion that nothing more than the skill of the mechanic was required or used in making any of the devices and combinations found in the first six claims of Johnson's patent.

The three remaining claims are for the combination of the metal rod of Johnson, or a similar rod unfastened and embedded in the lower

part of a concrete flooring, or of the concrete ribs forming part of a concrete flooring, or of the concrete ribs forming part of it, with wires suspended from the bar extending out of the concrete below the floor or ribs, and constituting ceiling hangers by which metallic or other lathing or ceiling may be, and in some claims is, described as suspended beneath the flooring. There was nothing new in the suspension of metallic lathing and ceilings beneath concrete floor by means of wires suspended upon metal rods in or beneath those floors when Johnson claims to have made his invention. Orr, in his patent No. 471,772, March 29, 1892, shows a ceiling suspended on wires looped around the metal supporting rods of his concrete flooring. It is said that Orr's patent does not anticipate the claims in Johnson's patent upon this subject because the supporting rods were not embedded in the concrete. It is true that in one place in his specification Orr writes of the cement ribs resting on the bars. But in another portion of his specification he writes:

"The lathing C of woven wire or perforated metal is secured to the suspenders, preferably by lacing wires a, as shown in Fig. 2, these wires being placed about the suspenders before the cement is applied."

And in the second claim of his patent he writes, speaking of the body of the cement forming a web:

"Said web lying above said suspenders, and the ribs extending downward from said web, and having the suspenders embedded therein, substantially as described."

So that the contention that the rods of Orr were not embedded in the concrete is not sustained. Moreover, even if they were not so embedded, no man of ordinary mechanical skill, with Orr's patent and the problem of suspending a ceiling below the concrete flooring of Johnson before him, could fail to conceive the idea of hanging it by wires attached to the rods embedded in the lower part of the concrete flooring or of the ribs, and allowing these wires to depend below it to uphold the ceiling. There are other descriptions and patents of ceilings hanging below concrete flooring, antedating Johnson's alleged invention, too suggestive to allow the combinations of claims 7, 8, and 9 of his patent to be attributed to his genius as an inventor.

The conclusion is that all the devices and combinations of the claims of this patent to Johnson were so obvious, in the light of the state of the art when Johnson claims to have conceived them, that they can be legally attributed to nothing but the skill of the ordinary mechanic, that the decree below was right, and that it must be affirmed.

It is so ordered.